IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-12-245 |
| | § | CIVIL ACTION NO. H-17-2978 |
| GWENDOLYN CLIMMONS- JOHNSON, | § | |
| | § | |
| Defendant-Movant. | § | |

## <u>MEMORANDUM AND RECOMMENDATION</u>

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Movant Gwendolyn Climmons- Johnson's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No.147),[1] Memorandum in Support (Document No.151), and Supporting Exhibits (Document Nos. 148, 169, 184), the United States's Response to § 2255 (Document No. 188), and Movant's Reply to the Government's Response (Document No. 193). After reviewing the parties' submissions, the record of the proceedings before the District Court in the underlying criminal case and on appeal, the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that Movant Gwendolyn Climmons- Johnson's § 2255 Motion (Document No. 147), be DENIED.

## I.    Procedural History

Movant Gwendolyn  Climmons-Johnson ("Climmons-Johnson"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28

---

[1] Gwendolyn Climmons-Johnson's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-17-2978 and at Document No.147 in Criminal Action No. H-12-245.

U.S.C.§ 2255. This is Climmons-Johnson's first attempt at § 2255 relief.

By way of background, on April 26, 2012, Climmons-Johnson was charged in a five count Indictment with conspiracy to commit health care fraud, and health care fraud relating to the ambulance company that she owned and operated. (Document No. 1). Following a three day jury trial, Climmons-Johnson was found guilty on all five counts. (Document No. 57).

Prior to sentencing, a Pre-Sentence Investigation Report ("PSR") was prepared. (Document Nos.75, 76, 88), to which Climmons-Johnson filed written objections (Document Nos 74). Climmons-Johnson also submitted a Memorandum in Aid of Sentencing. (Document No. 91). With respect to the calculation of Climmons-Johnson's advisory sentencing guideline sentence, the record shows that Climmons-Johnson had a base offense level of 24. Because of Climmons-Johnson's role in a scheme to defraud Medicare, which involved five or more participants under U.S.S.G. § 3B1.1(a), the offense level was increased by four. The offense level was increased by two levels for abuse of the public trust pursuant to U.S.S.G. § 3B1.1. With an adjusted offense level of 30, and with a criminal history category of I, Climmons-Johnson had an advisory guideline sentencing range of 97 to 121 months.

Climmons-Johnson was sentenced on June 13, 2014, to 97 months, which was ordered to run consecutively to any sentence imposed in Harris County, Texas, Cause No. 1381136, and to be followed by a total three year term of supervised release. Climmons-Johnson was further ordered to pay a mandatory assessment of $500, and restitution to Medicare of $972,132.22. (Transcript of Sentencing Hearing, Document No.113, p.40-42). In imposing sentence, the Court stated:

> Gwendolyn Climmons-Johnson is before the Court this afternoon for sentencing after being found guilty by a jury of the following offenses: Conspiracy to commit health care fraud, one count, and health care fraud, aiding and abetting,

four counts.

The evidence revealed that the Defendant was the owner and operator of Urgent Response Emergency Medical Services, LLC, a Texas entity that purportedly provided nonemergency ambulance services to Medicare beneficiaries in the Houston area.

The Defendant's conduct served as the basis of the fraudulent claims filed to Medicare. Specifically from approximately January 2010 and continuing to approximately December 2011, the Defendant, as owner of the aforementioned business, billed Medicare for ambulance transports between the home of patients, that is, Medicare beneficiaries, and mental health treatment facilities when the Defendant knew that the ambulance transport services were not medically necessary and/or not provided.

During the course of the instant offense, the Defendant participated in the conspiracy which resulted in defrauding Medicare in the total billed amount of $2,427,092.77 and an actual loss of $972,132.22.

The Defendant was held accountable in the guidelines for the total intended loss amount attributable to her. The Defendant abused the position of trust as owner of Urgent Response with Medicare, who relied on her to submit legitimate claims for reimbursement. The Defendant's abuse of her position of trust significantly facilitated the commission and/or concealment of the offense.

The Defendant was assessed a four-level increase in the guideline calculations for being an organizer or leader of a criminal activity that involved five or more participants, including but not limited to five former EMTs at Urgent Response whom she either recruited or directed to assist in the fraudulent scheme.

The Defendant is a 53-year-old wife and mother of one son.

The Defendant did not accept responsibility for her involvement in the instant offense, as she plans to appeal the jury's verdict.

The Defendant has no criminal convictions.

She was arrested on January 15, 2013, while on bond for the instant offense on charging of security execution of a document by deception gerater than or equal to $200,000 in Harris County, Texas, Cause No. 1381136, and the case's position is pending.

The large amount of money fraudulently obtained over the course of this

3

scheme is significant.

> Considering the above factors and in conjunction with the factors listed under 18, United States Code, Section 3553(a), I believe that a sentence at the bottom of the guideline range, 97 months, is appropriate and would adequately reflect the seriousness of the offense, promote respect for the law, provide deterrence to future criminal conduct, and address the Defendant's background and characteristics.

> Further, it is the—any sentence that should be imposed in cause–Harris County, Texas, Cause No. 1381136 will run consecutively to any sentence handed down in this case. (Document No. 113, pp. 37-40)

Judgment was entered on June 23, 2014. (Document No. 96). Climmons-Johnson appealed her conviction to the Fifth United States Court of Appeals. Climmons- Johnson argued that the Court erred in admitting into evidence several of the Government's exhibits, and in refusing to timely provide an instruction to the jury that the failure to comply with civil rules and regulations does not establish criminal liability. The Fifth Circuit rejected all of Climmons-Johnson's arguments and affirmed her conviction and sentence. (Document Nos. 142, 143). Climmons-Johnson filed for certiorari review with the United States Supreme Court. The United States Supreme Court denied the petition on October 3, 2016. (Document No. 145). On or about October 3, 2017, Climmons-Johnson mailed the instant § 2255 motion, which was filed October 5, 2017. (Document No. 147). Climmons-Johnson argues that she was denied her constitutional right to effective assistance of counsel both at trial and on appeal. The Government has answered. The Government maintains that Climmons-Johnson has not and cannot show she was prejudiced by the alleged deficiencies of either trial or appellate counsel.

## II. Discussion

### A. Ineffective Assistance of Counsel claims

Claims of ineffective assistance of counsel are generally measured by the standard of

*Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had. *Strickland*, 466 U.S. at 687. Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable. *Id.* at 687-88. The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable. *Id.* at 694-95. Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief. The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *United States v. Seyfert*, 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied*, 509 U.S. 921 (1993) (citing *Strickland*). To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Under the prejudice prong of *Strickland*, a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. When ineffectiveness claims relate to counsel's performance at sentencing, *Strickland's* deficiency prong is met when counsel fails to "research facts and law and raise meritorious arguments based on controlling precedent. *United States v. Fields*, 565 F.3d 290, 296 (5th Cir.), *cert. denied*, 558 U.S.

914 (2009)(citing *United States v. Conley*, 349 F.3d 837, 841 (5th Cir. 2003)). In addition, "'any amount of [additional] jail time has Sixth Amendment significance.'" *Lafler v. Cooper*, ___U.S.___, 132 S.Ct. 1376, 1386 (2012)(quoting *United States v. Glover*, 531 U.S. 198, 203 (2001)). Counsel is not required to "anticipate changes in law or raise meritless objections." *Fields*, 565 F.3d at 296.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied*, 467 U.S. 1220 (1984). The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland*, 466 U.S. at 690. "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)). Conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition. *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins*, 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

The United States Supreme Court in *Harrington v. Richter*, 526 U.S 86, 131 S.Ct. 770, 778 (2011) discussed *Strickland* in the context of a habeas proceeding involving a state conviction. While *Harrington* did not involve a federal habeas proceeding involving a federal conviction, the Court's discussion of *Strickland* and ineffective assistance of counsel claims is instructive and equally applies to claims brought in a federal habeas proceeding such as those raised herein.

With respect to ineffective assistance of counsel claims, the Court observed that "[t]here are, [ ] 'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Id.* at 788-89 (quoting from *Strickland*, 466 U.S. at 689). As a result, counsel's performance does not fall below that guaranteed by the Sixth Amendment where it can be shown that counsel formulated a strategy that was reasonable at the time and balanced limited resources with effective trial tactics and strategies. *Harrington*, 131 S.Ct. at 789. "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington*, 131 S.Ct. at 791. Moreover, "it is difficult to establish ineffective assistance when counsel's *overall* performance indicates active and capable advocacy." *Harrington*, 131 S.Ct. at 791 (emphasis added). Finally, in considering the prejudice prong of *Strickland*, the likelihood of a different result must be substantial, not just conceivable. *Id.* at 791-792 (Citations omitted). As a result, "'[s]urmounting *Strickland's* high bar is never an easy task.'" (quoting from *Padilla v. Kentucky*, 559 U.S. 356, 371(2010)). In part, because:

> Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.

*Harrington*, 131 S.Ct. at 778 (citations omitted). The *Strickland* standard applies to ineffective assistance of appellate counsel claims. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

Climmons-Johnson argues that her trial attorney, Mr. Cornel A. Williams, was ineffective for failing to investigate, interview, and call the witnesses she had suggested to testify at trial. According to Climmons-Johnson, counsel failed to present witnesses or evidence, which would have benefitted and aided her defense. According to Climmons-Johnson, counsel failed to conduct *any* pretrial investigation of known exculpatory witnesses such as Ray Koonce, Gilbert Sanchez, Mario Cesar Eruzo, Justin Odibo, Brenda Tillman, Gloria Foster, Jerry Johnson, Gladys Williams, Shodelyn Nicholas, Lamar Blount, and Chaketa Williams, who she claims could have and would have testified to her good faith defense that ambulance transports to partial hospitalization psychiatric facilities were covered destinations under applicable medicare regulations; that she was not engaged in the day-to-day business operations of Urgent Response; that she never discussed or instructed anyone to falsify run sheets or double load patients, and that disgruntled former employees of Urgent Response were cooperating with the government to cover up their own wrong doing. In support of this ineffectiveness allegation, Climmons-Johnson relies on affidavits of the above described witnesses, setting forth what each witness would have testified to if called.. (Document No. 148). Trial Counsel, Cornel A. Williams, has also filed an affidavit responding to Climmons-Johnson's ineffectiveness of counsel claims. The Affidavit of Mr. Cornel Williams, states in pertinent part:

> I have known Petitioner since 1981 when we met as first year law students at Thurgood Marshall School of Law. She has been a licensed attorney for over thirty years. From the beginning of my representation of her in this matter she has been actively involved in all phases of her trial and sentencing. Because she seldom practices criminal defense, it was a difficult process for me to represent her due to her lack of understanding of Federal Criminal Law and Procedure. She was constantly opposed of my investigation of her case as well as trial strategies decided upon during my representation of her. Each decision made by me was done after consulting with her.

8

The trial strategies regarding which witnesses to call ultimately were made in order to prevent these potential witnesses from cooperating the government evidence.

However, she demanded to weigh in on every decision that was made regarding her defense.

**Ground One** alleges Petitioner received ineffective assistance of counsel by reason of trial counsels failure to investigate, interview and or call exculpatory witnesses at trial. In support of said allegation, Petitioner has attached affidavits of Ray Koonce, Gilbert Sanchez, Mario Cesar Eruzo were EMS drivers for Urgent Response. Each of these individuals seem to address my failure to speak directly with these individuals about Petitioners trial case. I will address each one of these individually.

To the best of my recollection, Petitioner hired an investigator to obtain recorded statements of EMS drivers who would possibly provide statements of witnesses which could possibly be used in the Petitioner's defense at trial. I was provided taped conversations of EMS drivers for Urgent Response witnesses by an investigator which was hired by Petitioner. None of the information provided by the investigator would have aided Petitioners defense at trial. I determined after trial that Petitioner requested the investigator to obtain sworn statements from some of these individuals.

It appears from the reading of Roy Koonce's affidavit, that it was prepared in April of 2014, some six months after trial ended. The contents of his affidavit appear to give a contradictory analysis of testimony given at trial by various government witnesses, which Mr. Koonce would not have had any personal knowledge. Mr. Koonce's affidavit appears to have been prepared by someone other than himself who would have personal knowledge of the facts and testimony given at Petitioner's trial. The only relevant portion of Mr. Koonces' affidavit was that I never contacted him regarding him testifying at trial. Petitioner's investigator or Petitioner herself would have spoken with Mr. Koonce and provided me with his possible testimony. Once I reviewed his testimony, I made a determination as to if it would be helpful to Petitioner's trial. Given the facts attested to by Mr. Koonce in his April 2014 affidavit, I would not have used him as a witnesses because I do not consider his statement to be useful to Petitioner's defense at trial because while he states he was never asked to do anything illegal, like transport any patients I deemed were not eligible to be transported; like falsify any run reports concerning patients, he would not have been able to explain why every run sheet prepared by him contained essentially the same or similar information as all other EMS employees of Urgent Response.

As to Gilbert Sanchez, his allegations in his affidavit seem to mirror those of Ray Koonce. For example, "Both Mr. and Mrs. Johnson were good, honest, hardworking people." "I can tell you that I was not instructed by her or anyone else through her, to do something illegal as an EMT while I worked at Urgent Response." "I was never asked to lie on my run sheets." Upon review of Ray Koonce affidavit, these same or similar responses were given. The entire affidavit of Gilbert Sanchez attempts to contradict the facts and testimony given at trial by Government witnesses. The only relevant portion of [Mr.] Sanchez's affidavit was "one of the investigators in Ms Johnson's case visited me last year. . . ." As Petitioners trial attorney, I would not have been the person who contacted this witness. To the best of my recollection, an investigator hired by Petitioner did indeed contact Mr. Sanchez and others about the facts of the case. After a review of his findings, which were recorded statements, I made the decision that Mr. Sanchez's testimony would not be of any assistance to Petitioner at her trial. My major concern with Mr. Sanchez's testimony would have been how he would explain why each patient's information provided on run sheets prepared by him mirrored those of other transports made by Urgent Response.

The affidavit of Mario Cesar Eruzo while dated October 1, 2017, made similar allegations as Mr. Koonce and Mr. Sanchez in that the Johnsons were honest people and he was never asked by management to falsify any EMT assessments as to any of the patients he transported. To the best of my recollection, Mr. Eruzo also gave a recorded statement to an investigator regarding his role at Urgent Response. After listening to his recorded statement with Petitioner, we discussed his interview in detail and decided that his statement did not property address why the run sheets he was to have alleged to have prepared used almost verbatim language as the majority of the run sheets prepared by Urgent Response which were submitted to Medicare for the billing of services. In my opinion, none of these three witnesses, (Koonce, Sanchez or Eruzo) would [not] be able to give a rational reason as to why each run sheet was prepared using the exact same template used by Urgent Response to bill Medicare. The affidavit of Mr. Eruzo does nothing to change my mind as to my decision not to call him as a witness in Petitioner's trial because he never addresses what he put on the run sheets and why the information of these run sheets contain similar or the same information as almost every patient which was transported by Urgent Response. Mr. Eruzo's affidavit only seems to attest to the character of Ms. Johnson and does not provide anything of substance which would have addressed the ultimate issues in the defense of Petitioner.

The affidavit of Justin Odibo provides nothing that would have benefitted Petitioner's defense at trial. As a Firefighter EMT with the Houston Fire Department who had a paid professional relationship with Petitioner, his testimony could have been interpreted by a juror as bias. Furthermore, Mr. Odibo would have had to explain the run sheets produced by Urgent Response EMT's which made the same or very similar assessments for every patient. The cross-examination of Mr. Odibo

by the government would, without a doubt destroyed my defense strategies at trial. Furthermore, Mr.Odibo had no personal knowledge of the issues the government alleged in the indictment of Petitioner. He had nothing exculpatory to aid in the Petitioner's trial defense and his testimony would have allowed the government to cross examine him as to the run sheets which was critical to the governments case.

The affidavit of Brenda Tillman was taken in April of 2014 some six months after the conclusion of trial. Ms. Tillman was interviewed by government agents, however, she had no personal knowledge as to how the run sheets were prepared or what billing procedures Urgent Response used to bill Medicare. While she states in her affidavit, "Although I had multiple patients transported by Urgent Response from my residential facility, they were transported separately because I remember units had to double back to pick up the patients one at a time." She then goes on to contradict this statement by saying, "Urgent Response did not bill for any other transports of my other residents."

Ms. Tillman's affidavit addresses issues which were specifically addressed by government witnesses during Petitioner's trial. She appears to attempt to provide facts which would contradict evidence presented at Petitioner's trial. I do not recall ever speaking with Ms. Tillman prior to trial. However, as an owner of a group home, she would have been open to cross examination by the government on matters which would not have aided Petitioner's defense.

The affidavit of Gloria Foster contain no allegations regarding my failure to investigate. I did speak with Ms. Foster prior to trial and made the decision not to call her as a witness because she had no personal knowledge of the billing procedures of Urgent Response.

At some point prior to trial, I was provided a taped conversation between petitioner and government witness Mike Johnson and David Bailey. The recording was a self serving question and answer episode where Petitioner asked scripted questions of Mr. Johnson and Mr. Bailey regarding improprieties of various transportation issues at Urgent Response. Neither Mr. Johnson nor Mr. Bailey were aware that the conversations between them and Petitioner were being recorded. After reviewing the recordings along with my trial co-counsel, Sean Buckley and petitioner, a decision was reached by the parties not to attempt to introduce the recordings. Our decision was based upon the fact that the recording was self serving and in order to introduce the recording, the Petitioner would have to testify on the record. Petitioner made a informed decision not to testify at trial.

I interviewed Jerry Johnson shortly after I was retained by Petitioner. It was immediately evident to me that Mr. Johnson would not make a very good witness for various reasons. Aside from his not being able to adequately articulate the facts, he

was married to Petitioner. As such, although he was employed by Urgent Response there was no evidence that he had an active role in the conspiracy. After discussing this with Petitioner, I had no reason to have any further communication with Mr. Johnson regarding his testifying at trial. However, I did have other conversations with him regarding the day to day operations of several Urgent Response as well as the roles of former employees of the company.

The representations made in Mr. Johnson affidavit signed on September 30, 2017, are simply false. The most important lie he gives states "Cornel Williams had told her he never files objections to these types of reports." During my 25 years of criminal federal litigation, I have never failed to file objections to a Presentence investigation Report. Mr. Johnson obviously believes whatever Petitioner had told him and a review of the Petitioner's docket sheet will prove objections were filed in her case. Mr. Johnson's affidavit contains his personal opinions as what he believes I did not do in the defense of Petitioner. Unfortunately, most of his beliefs are based upon what Petitioner told him as opposed to his own personal knowledge.

Mr. Johnson's affidavit signed on May 15, 2014, appears to be information he provided to me regarding former employees of Urgent Response. I can recall speaking to Mr. Johnson on more than one occasion about former employees of Urgent Response after reviewing government statements taken from these former employees. Mr. Johnson's affidavits do nothing to change my decision not to have Mr. Johnson testify at trial.

Petitioner has attached the affidavits of Gladys Williams and Shondelyn "Shay" Nicholas as exhibits in support of her claim of failure of counsel to investigate. However, neither of these affidavits have been sworn to by these individuals. I was able to contact Gladys Williams, who informed me that she as contacted by an individual who requested her to sign an affidavit, but Ms. Williams never signed an affidavit. Such conduct leaves me to believe that all of the affidavits presented by Petitioner in the case to support her claims were prepared by Petitioner or by someone at the request of the Petitioner. Such conduct is unethical and tenders upon obstruction of justice by the Petitioner.

As trial counsel for Petitioner, I fully investigated all of the witnesses made available to me by Petitioner. After consulting with either the investigators provided by Petitioner or meeting personally with witnesses, I determined that harm from their testimony would far outweigh any benefits provided by these witnesses. Again, I believed it would be a more sound trial strategy to impeach the government witnesses through cross examination than to have my witnesses assist the government prove their case.

**Ground Two** alleged Petitioner received ineffective assistance of counsel by reason

of failure to investigate, interview and call expert witnesses to testify at trial.

Petitioner herself retained Lamar Blount to review claims which she herself provided to Mr. Blount. To the best of my recollection, Petitioner and I spoke with Mr. Blount regarding the allegations in the indictment and how he could possible assist Petitioner's defense. After speaking with Mr. Blount, I specifically informed him to contact Petitioner with his findings after he had conducted a review of the documents Petitioner forwarded to him. I never heard back from Mr. Blount. Petitioner never mentioned to me or provided any expert report or analysis of the documentation given to Mr. Blount.

On February 23, 2018, I spoke with Mr. Blount regarding his involvement as Petitioners potential expert testimony. I was informed by Mr. Blount that he never produced a report of his findings. He further stated that he recalls speaking with Petitioner and informing her of several problems with the run sheets. Therefore, he never prepared any expert report because he knew such a report would not be beneficial to Petitioners defense. Furthermore, had he produced any report, I would under the rules of criminal procedure, had to tender a copy of said report to the government. Petitioner never shared this information with me.

Petitioner had independently retained the expert. As such, it was her responsibility to inform her trial counsel of any and all reports produced by her expert. Given the conversations I had with Mr. Blount on February 23, 2018, it is clear why Petitioner did not reveal the conversations she had with her retained expert.

As to Petitioners allegation that she made a good faith reliance upon her belief that the transports made to the Partial Hospital Program, she failed to address the fact that the patients did not meet the criteria for ambulance transports. The government had evidence clearly showing the transporters were not properly secured during their transports. Video footage of Petitioners transports showed patients jumping out of the ambulance without any assistance and without being restrained inside of the ambulances. This fact, coupled with the run sheets reflecting the patients being flight risk, threat to self or others would not have supported a good faith reliance upon the transports being lawful under Medicare.

The Petitioners third and final allegation in her motion under 28 U.S.C. 2255 is trial counsel failed to investigate and call witnesses regarding the claims billing data the government provided and relief upon at trial and sentencing. The evidence Petitioner relies upon is two fold: 1) failure to investigate and interview her retained healthcare expert and 2) the failure to interview and call her billing and coding specialist Chaeta Williams with NW Health Management Company. I have previously addressed any rationale for not producing the expert retained by Petitioner.

I will now address the affidavit alleged to have been prepared by Chaketa Williams. To the best of my recollection, I spoke with Chaketa Williams prior to trial regarding her involvement with Urgent Response. After speaking with her, I was informed that while it was "customary to bill at three (3) time the contract rate", she could not adequately explain the rationale for doing so. She further explains in her affidavit "we know that Medicare or Medicaid will only pay 163.00-175.00 per transport and 5.00 for each mile transported." Given this rationale I believed because Ms. Williams was billing Urgent Response a percentage of the monies recovered, it would appear that she was attempting to get a larger fee from Urgent Response by billing an amount much higher that the contracted rate the government agrees upon.

In my opinion, this line of questioning would not have been helpful to Petitioners trial defense. Furthermore, if called as a witness, Ms. Williams would have had to testify that she would only bill Medicare/Medicaid based upon the information provided to her by Urgent Response. That information would indicate run sheets prepared by the company which all reflected the same or similar symptoms for each patient. Any statements Ms. Williams previously given to federal agents would not have overcome her testimony regarding how and what she ultimately billed the government on behalf of Urgent Response EMS. While Ms. Williams states she "never witnessed evidence of illegal activity with Urgent Response EMS or its owners Gwen or Jerry Johnson," her potential trial testimony would not have provided any information as to if the transports were to a legal facility or whether the patients transports conformed with the rules and regulations of Medicare/Medicaid.

After a full review of the allegations made by Petitioner in her motion, I believe none of them have any merit. It is further my belief that Petitioner has prepared the majority, if not all of the affidavits used as exhibits in her motion. I have personally spoken to Gladys Williams, who has told me she never prepared the affidavit in question. I also spoke to Shondelyn Nicholas, who also stated she never prepared or signed the affidavit filed by Petitioner. If Jerry Johnson was as articulate in person as his affidavit he allegedly prepared, I may have indeed used him as a witness at trial. My telephone conversations with Lamar Blount gave sufficient reasons to believe Petitioner intentionally withheld his findings from me because his findings would directly contradict all of Petitioners contentions regarding her innocence. I also spoke with an ex employee of Urgent Response who provided information on Petitioners complicity in the matter. Counsel will provide said information at a hearing, should this Honorable Court request a hearing. (Document No. 178)(emphasis in original).

"To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant

must name the witness, demonstrate that the witness would have testified, set out the content of the

14

witnesses's proposed testimony, and show that the testimony would have been favorable." *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010)(citing *Alexander v McCotter,* 775 F.2d 595, 602 (5th Cir. 1985)). The Fifth Circuit has cautioned that because "presentation of testimonial allegations of what a witness would have testified are largely speculative," complaints of uncalled witnesses are not favored in federal habeas review. *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007))(quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978)).

Upon this record, having considered the contents of the affidavits submitted by Climmons-Johnson, and that of Mr. Williams, and culled through the trial transcript, the undersigned Magistrate Judge concludes that no relief is available on the merits of her ineffectiveness claim based on counsel's purported failure to investigate and call witnesses at trial. Mr. Williams's affidavit shows that he was aware of the witnesses but that he made a tactical decision not to call the witnesses, and, instead to impeach the government witnesses through cross-examination. Indeed, the witness list filed on October 28, 2013, included Gladys Williams, Chaketa Williams, Gilbert Sanchez, Mario Eruzo, Brenda Tollman, Maria Smith and Gloria Foster (Document No. 52) but as detailed in his affidavit, Mr. Williams made an informed strategic decision not to call the witnesses. For example, Mr. Williams states that on cross-examination former Urgent Response employees, Ray Koonce, Gilbert Sanchez and Mario Eruzo would have been questioned about their run sheets, which contained essentially the same or similar information. Mr. Williams states that he decided not to call Justin Odibo because he had a paid professional relationship with Climmons-Johnson, his former attorney, and, also because he had no personal knowledge of non-emergency ambulance transports.

Climmons-Johnson claims that counsel was ineffective for failing to call as a witness, Brenda Tillman. Brenda Tillman's affidavit states, in part, that Climmons-Johnson and her husband,

15

Jerry Johnson, were honest people, who ran a "top notch company." Mr. Williams states, that while he did not recall speaking with Ms. Tillman, prior to trial, as a tactical matter, he would not have called her given the inconsistencies in the affidavit regarding multiple transports from the group home she operated, and which would have helped prove the government's case on cross-examination.

Movant alleges that counsel was ineffective in failing to call as a witness, Gloria Foster. In her affidavit, Ms. Foster states that she worked as Climmons-Johnson's legal assistant from 1988 until June 2014. Ms. Foster states, in pertinent part, that Jerry Johnson, Climmons-Johnson's husband, ran Urgent Response on a day-to-day basis. Gloria Foster's affidavit, like all the other affidavits, describes Climmons-Johnson as an honest businesswoman, and describes the former Urgent Response employees who testified at trial as being motivated by jealousy. Mr. Williams's affidavit confirms that he spoke with Ms. Foster but made an informed decision not to call her because she had no personal knowledge of the billing procedures of Urgent Response.

Movant also alleges that counsel was ineffective in failing to call as a witness, Jerry Johnson, her husband. Mr. Johnson submitted an affidavit, detailing his proposed testimony concerning former Urgent Response employees such as Jason Schmidt, Max Rodriguez, David Bailey, Anntannete Brewer, and Ron Taylor. He also states that Mr. Williams never files objections to a Presentence Investigation Report. In response, Mr. Williams states that he has never failed to file objections to a Presentence Investigation Report. Indeed, the docket sheet confirms that objections were filed by Mr. Williams and argued at the Sentencing Hearing. With respect to Mr. Johnson's statements relating to the former Urgent Response employees, Mr. Williams confirms that he discussed the former employees with Jerry Johnson, and that he had also reviewed statements given

by the former employees to the Government. Mr. Williams further states that he was provided a taped scripted conversation between Climmons-Johnson and two former Urgent Response employees, Mike Johnson and David Bailey. Mr. Williams states that he reviewed the recordings with Climmons-Johnson, and co-counsel, Sean Buckley, and that they collectively concluded not to introduce the recording, because Climmons-Johnson had made an informed decision not to testify. In addition, Mr. Williams states that he made an informed decision not to call Jerry Johnson based on potential bias as a spouse.

Climmons-Johnson also relies on affidavits Gladys Williams, a group home owner, and Shondelyn "Shay" Nicholas, an employee of Gladys Williams. The affidavit of Gladys Williams states that Climmons-Johnson and her husband "ran a great ambulance service" and describes one of the residents of the group home, Maria, who had been transported by Urgent Response, and who has a long psychiatric history. Similarly, the affidavit of Shondelyn Nichols, makes similar statements about Maria, and she adds that every patient in "Ms. Gladys's care has some form of psychosis." Mr. Williams has responded to the affidavits. Mr. Williams states that both affidavits are undated and unsworn. Mr. Williams further states that he contacted Gladys Williams and Shondelyn Nichols. Both women denied preparing the affidavits submitted to the Court by Climmons-Johnson.

In addition to the above lay witnesses, Climmons-Johnson claims that counsel was ineffective in failing to investigate, interview and call as expert witnesses, Lamar Blount and Chaketa Williams. In particular, Climmons-Johnson alleges that she retained Lamar Blount, a health law expert/consultant, and that his testimony would have supported her innocence. In support of her claim, Climmons-Johnson has attached an affidavit of Mr. Blount, in which he states he was

formally engaged by Movant on May 1, 2013, outlines the scope of his engagement, his qualifications. Mr. Blount details the areas where there was a reasonable basis for Climmons-Johnson's beliefs about ambulance transports to partial hospitalization programs but states, in pertinent part: that "her understanding of the Medicare requirements were not correct in several key points." Mr. Williams confirms that he had a conversation with Mr. Blount and Climmons-Johnson about the allegations in the Indictment and how Mr. Blount he could best assist in the defense. Mr. Williams states that Mr. Blount, was to contact Climmons-Johnson. Mr. Williams states that he was never provided an expert report or analysis prepared by Mr. Blount. He further states, that in response to the instant allegations of ineffectiveness, he contacted Mr. Blount, who confirmed that he had not prepared a written report because of problems with the run sheets. Mr. Blount's affidavit, contains to reference to an expert report.

Climmons-Johnson further alleges that counsel was ineffective in failing to investigate and call as an expert witness, Chaketa Williams, who was employed by Urgent Response to do their billing from February 2010 through January 2012. In her affidavit, Chaketa Williams states in pertinent part, that it was "customary in the industry to bill at least (3) times the contract rate for Medicare, Medicaid health benefit plans." She also states in pertinent part, "I was accused in a state criminal case in reference to my professional work. Those charges were erroneous and eventually dismissed" and that she was "asked to assist federal agents and with counsel, handed over all records in possession pertaining to Urgent Response" and "produced a flash drive." Mr. Williams has responded to Climmons-Johnson's claim. Mr. Williams states that he spoke with Chaketa Williams, prior to trial. Based on this conversation, Mr. Williams concluded her testimony would not be helpful due to problems on cross-examination. In sum, Mr. Williams made a tactical and strategic

decision not to call Chaketa Williams as an expert witness.

In conclusion, Climmons-Johnson has not shown that she was prejudiced by counsel's failure to call witnesses the above witnesses. Counsel's decision was consistent with his trial strategy of not presenting witnesses, who, on cross-examination, could have and would have corroborated the government's evidence, and, to instead impeach government witnesses through cross examination. The proposed testimony had the potential of undermining Climmons-Johnson claim that she had a good faith reliance of the lawfulness of the transports. Moreover, as articulated by counsel, the evidence of guilt was strong. The government presented evidence from nine witnesses, medical claims data, and photos, which showed that Movant directed employees to transport unqualified patients to unqualified destinations which were not covered by Medicare, directed the employees to submit false run reports of the provided services, and that claims totaling $2,327,092.77 were billed and $972,132.22 were paid. The first two witness, Stephen Ward, and Christopher Souders, testified about Medicare rules relating to ambulance companies, the steps an ambulance company must take to enroll in the program, the types of transports covered, and the claims submission process. The government presented testimony from former Urgent Response EMS employees, David Lee Bailey, and Anntanette Brewer. David Bailey testified that Climmons-Johnson called the "shots" at Urgent Response. (Doc. 105, p. 161). According to David Bailey, Climmons-Johnson ran employee meetings and gave instructions as to whom to pick up at a group home and transport. (Doc. 105, p. 162-163. Doc. 106, p. 67-68). The record further reflects that David Bailey testified Climmons-Johnson instructed him to transport more than one patient at a time. (Doc. No. 106, p. 5-13). David Bailey also testified that the information for the run sheets was provided by Climmons-Johnson. (Doc. 105, p. 190-201, Doc. 106, p. 67). With respect to the transports, David Baily testified that

he never restrained a patient in an ambulance, and in fact, there were no restraints in the ambulance. He testified that none of the patients he transported were combative, a danger to self or others at the time of transport, and the patients could have ridden in another form of transportation. (Doc. 105, p. 163-164). David Bailey testified about transporting patient Barbara Johnson on August 24, 2011, August 18, 2011, and August 5, 2011. In connection with his testimony, the Government introduced run sheets and photographs of him escorting patient Barbara Johnson, walking with a cane off the ground, into a facility, having been transported by ambulance. David Bailey testified that he had transported Barbara Johnson several times, and that she was never combative, a danger or self to others, or confined to bed. (Doc. 105, p. 168-175. 178-190). In addition, the government also introduced patient information sheet, run sheets, and photos of Robert Green who was transported on August 16, 2011, and on August 24, 2011. (Document No. 105, p. 190-201, Document No. 106, p. 67). The record further reflects that David Bailey testified about an incident in January 2012. According to David Baily, he and Michael Johnson, were asked to sign an affidavit that had been prepared by Climmons-Johnson. David Bailey testified that he refused to sign the affidavit and, shortly thereafter, quit working at Urgent Response. (Doc. 106, p. 16-23).

Also testifying at trial was Anntanette Brewer, who had worked at Urgent Response from February through May 2010 as a basic EMS. (Document No. 106, p. 113-133). Anntanette Brewer testified that she had been interviewed and hired by Climmons-Johnson. (Doc. No. 106, 113-144). She further testified that Climmons-Johnson ran meetings and sent her a schedule of transports via text message. (Document No. 106, p. 115-116). Anntannette Brewer testified, in detail, about transports for Curtis Smith, Edgar Richardson, Kenneth Walker, and Rebecca Johnson. She denied ever transporting a combative patient or a patient that was a danger to self or others, or restraining

a patient. She further testified that Climmons-Johnson returned run sheets with instructions to re-write narratives in the run sheets. (Document No. 106, p. 122-123). Anntannette Brewer further testified that she had transported multiple patients but had written the run sheet to reflect a single transport. (Document No. 106, p. 125).

The government also presented testimony of Mary Bardwell. She was employed from 2008 to 2011. Mary Bardwell testified that Climmons-Johnson gave the criteria for the run sheets, reviewed the run sheets, and would ask the EMT's to re-write run sheets. (Document No. 106, p. 186-196). Mary Bardwell also testified that Climmons-Johnson was involved in the day-to-day operations of Urgent Response. (Document No. 106, p. 201-203).

The government introduced evidence relating to several individuals who had been transported by Urgent Response EMS. Brenda Martin, who lived in a group home operated by Gladys Williams, testified. Brenda Martin testified that Gladys Williams arranged for the ambulance transport. (Doc. 106, p. 83-94, 96). Brenda Martin denied needing to ride in an ambulance. In fact, she testified she had been out walking her dog before the Urgent Response ambulance arrived. Once in the ambulance, Brenda Martin testified that she had never been restrained.(Doc. 106, p. 84-86). Brenda Martin denied being a flight risk, agitated, combative or requiring constant monitoring during transports in October 2010, March 2011, April 2011, or June 2011. (Document No. 106, p. 89-93).

The government also presented testimony from Claxon Larrie. Claxon Larrie testified about being transported by ambulance to a devotion center where he would watch movies, do crafts and play bingo, three or four days week. (Document No. 106, p. 98-109). He was shown a photograph of the apartment complex where he lived on the second floor. Claxon Larrie testified that he would walk down the stairs and walk to the ambulance. He denied being restrained, combative and a

danger to himself or others. He testified that when he was not being transported by ambulance, he would go places by car, bus or on foot. (Document No. 106, p. 105-108).

The government also introduced testimony of Shelly Kuhn. (Document No. 106, p. 162-172, 180). She testified about the medicare enrollment application and online provider enrollment submitted by Urgent Response. Both were signed by Climmons-Johnson, as the owner of Urgent Response. (Document No. 106, p. 163-172).

The government presented evidence about claims submitted by Urgent Response to Medicare, and payments made by Medicare. Shannon Brady, a Special Agent with the FBI, testified that from January 23, 2010 to December 12, 2011, Urgent Response billed Medicare $2,427,092.77. Medicare paid $972,132.22. (Document Nos. 106, p. 234-258 & Document No. 116, p. 7-8). She testified, in detail, about claims submitted for Robert Green and Barbara Johnson. (Document No. 106, p. 237-258).

The record further shows that counsel cross-examined witnesses. (Document No. 105, p. 126-135, 151-156, Document No. 106, 23-62, 69-83, 94-97, 109-113, 136-160, 172-180, Document No. 116, 20-43). In addition, based on argument by counsel, the jury was instructed that a violation of civil statutes, rules, regulations, ethical standards or care is not a crime, and the instruction was included in the jury charge. (Document No. 106, p. 136, Document No. 116, p. 67). In sum, the contemporaneous record shows that Mr. Williams was prepared for trial, and effectively cross-examined the government's witnesses. Mr. William's overall trial performance did not fall below that of *Strickland.* Climmons-Johnson has not shown that any of the witnesses she maintains could have and should have been called to testify would have affected the outcome of the trial in light of the overwhelming evidence of guilt. *See, e.g. United States v. Bochicchio,* Civ. No. C-08-310, 2009

22

WL 277741 S.D.Tex., Feb. 4, 2009)(denying ineffective assistance claim for failing to elicit allegedly exculpatory testimony from the defendant's girlfriend and noting that the movant "fails to take into account the risks that the jury would have found her story not credible or would dismiss her testimony as entirely as biased. Additionally, she would have been subject to cross-examination, and the United States may have been able to impeach her through other witnesses as well.").

To the extent that Climmons-Johnson alleges that counsel was ineffective at sentencing by failing to file objections or objecting to the loss amount calculation, the record shows that counsel filed objections to the PSR , including the loss amount calculation. The fact that the objections were overruled does not mean that his attorney's performance was deficient. *Youngblood v. Maggio*, 696 F.2d 407, 410 (5th Cir. 1983). Conclusory allegations are insufficient to raise an issue of ineffective assistance of counsel. *Miller,* 200 F.3d at 282. This ineffectiveness claim fails.

Climmons-Johnson further claims that appellate counsel was ineffective for failing to present appellate issues such as that the Sentencing Guidelines were advisory. The law is clear that appellate counsel need not raise every non-frivolous issue on appeal. "[A] reasonable attorney has an obligation to research relevant facts and law, or make an informed decision that certain avenues will not prove fruitful. Sold, meritorious arguments based on directly controlling precedent should be discovered and brought to the court's attention." *United States v. Williamson*, 183 F.3d 458, 462-463 (5th Cir. 1999)(footnote and citations omitted). Here, Climmons-Johnson has not shown that any of the issues that she maintains could have and should have been raised by appellate counsel would have been "sufficiently meritorious such that [counsel] should have raised it on appeal." *United States v. Phillips*, 210 F.3d 345, 348 (5th Cir. 2000). There is nothing in the record to support Climmons-Johnson's claim that the Court considered the Sentencing Guidelines were mandatory.

Indeed, Paragraph ¶ 93 of the PSR states in pertinent part: "In light of the Supreme Court opinion issued January 15, 2005, in *United States v. Booker*, 125 S.Ct. 738 (2005), the federal Sentencing Guidelines are now advisory only." (Document No. 75). Climmons-Johnson has not shown that appellate counsel failed to raise issues and claims that were clearly stronger than the issues raised. "The process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from evidence of incompetence, is the hallmark of effective appeallate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986). As such, Climmons-Johnson has not shown that appellate counsel's performance fell below that of *Strickland*.

In conclusion, Climmons-Johnson has offered no proof that deficient performance prejudiced her in any way either at trial or on appeal. *See Strickland*, 466 U.S. at 687. Thus no relief is available under § 2255 on Climmons-Johnson's ineffective assistance of counsel claims.

Finally, Climmons-Johnson appears to challenge the calculation of her guideline sentence. According to Climmons-Johnson, the Court erred in its calculation of the loss amounts, and the enhancements for her role in the offense and abuse of the public trust. The law is clear that this claim is not cognizable under § 2255. A Court's technical application of the Sentencing Guidelines does not give rise to constitutional issues. *United States v. Williamson*, 183 F.3d 458, 462 (5th Cir. 1999).

## III. Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED that the Government's Motion to Dismiss Movant's § 2255 Motion (Document No. 170) be GRANTED, and that Movant's § 2255 Motion (Document No.163) be DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within 14 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 27th day of November, 2018.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE